Daniel A. Robida v. Commissioner.
Robida v. Commissioner
Docket No. 4861-62.
United States Tax Court
T.C. Memo 1965-86; 1965 Tax Ct. Memo LEXIS 246; 24 T.C.M. (CCH) 451; T.C.M. (RIA) 65086; April 7, 1965
Daniel A. Robida, pro se, 4 Paulaneustrasse, Wiesbaden, Germany. Eugene H. Ciranni and James E. Merritt, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined the following deficiencies in income tax of the *247 petitioner and additions to tax under sections 6653(b) and 6654 of the Internal Revenue Code of 1954: Addition to Tax
Addition to Tax
Year
Deficiency
Under § 6653(b)
Under § 6654
1956
$ 7,235.68
$3,617.84
$202.60
1957
3,718.44
1,859.22
104.12
1958
3,583.28
1,791.64
100.33
1959
9,888.97
4,944.49
276.89
1960
13,381.91
6,690.96
374.69
1961
8,751.27
4,375.64
245.03
The assertion of additions to tax under section 6653(b) has been abandoned by the Commissioner and the issues left for decision are: 1. Did petitioner report all of his taxable income for the years in question? 2. What part of petitioner's income, if any, in the taxable years was exempt from taxation under the provisions of section 911, Internal Revenue Code of 1954? 3. Did petitioner underpay his estimated taxes in each of the years 1956 to 1961 so that he is liable for additions to tax under section 6654 of the Internal Revenue Code of 1954? Findings of Fact Petitioner, Daniel A. Robida, an individual, filed income tax returns for each of the taxable years 1956 to 1961, inclusive, with *248 the district director of internal revenue, Portsmouth, New Hampshire. The following schedule reflects the taxable income and income tax liability reported by the petitioner on his returns: Taxable
Tax Lia-
Year
Income
bility
1956
$ 889.00
$ 142.24
1957
703.00
112.48
1958
2,162.00
349.62
1959
3,592.37
606.80
1960
4,849.30
886.35
1961
6,255.82
1,262.11
Totals
$18,451.52
$3,359.60 Petitioner paid in full the income tax liabilities reported on his returns. The following schedule reflects the amount of income reported by petitioner on his returns as tax exempt under the provisions of section 911 of the Internal Revenue Code of 1954: Income Reported
Year
as Tax Exempt
1956
$ 1,900.00
1957
1,900.00
1958
9,000.00
1959
19,500.00
1960
19,900.00
1961
24,987.00
Total
$77,187.00 Note: In statements attached to the 1960 and 1961 returns petitioner states he should have listed $13,400 instead of $9,000 in 1958 and $21,952 instead of $19,900 in 1960. This "tax exempt" income was reported by petitioner on his returns as having been earned income abroad as a sales promoter and instructor in the *249 operation of machines under the terms of an employment agreement with Service Games Ltd. of Gotenda, Tokyo. On the return for 1961 petitioner's services under the agreement were described as "repairs of machines by soliciting, teaching and practicing the diagnosing and the manipulating of machines". Service Cames Ltd. was a manufacturer of slot machines. Petitioner never received any income for services or for any other reason from Service Games Ltd. of Gotenda, Tokyo in the taxable years. The Commissioner computed the deficiencies herein by the net worth plus nondeductible expenditure method, as follows: Year
Year
Year
Ended
Ended
Ended
Account
Dec. 31,
Dec. 31,
Dec. 31,
No.
1955
1956
1957
ASSETS: Cash
Rochester Trust Co.,
56305
$ 11.24
$ 0.00
$ 0.00
Rochester, New Hampshire
Industrial City Bank,
3235
1,128.01
0.00
0.00
Worcester, Massachusetts
Morthrift Plan, Sacramento,
1164
7,390.54
10,136.89
4,912.63
California
Guardian Thrift and Loan, San
249
7,019.60
1,271.75
1,650.48
Francisco, California
Schwabacher & Co., San
77193
1,389.04
520.40
(5,308.87)
Francisco, California
Fireside Thrift, San
3123
0.00
6,060.00
6,304.82
Francisco, California
West Coast Savings,
7222
0.00
0.00
0.00
Sacramento, California
Morthrift Plan, Stockton,
5573
0.00
0.00
0.00
California
Total Cash
$16,938.43
$17,989.04
$ 7,559.06
Stock
Cost of Stock acquired:
$40,354.34
$40,354.34
$40,354.34
1956
2,617.47
2,617.47
1957
13,932.30
1958
1959
1960
1961
TOTAL ASSETS
$57,292.77
$60,960.85
$64,463.17
LIABILITIES: NONE
NET WORTH:
$57,292.77
$60,960.85
$64,463.17
INCREASE IN NET WORTH:
$ 3,668.08
$ 3,502.32
NONDEDUCTIBLE DISBURSEMENTS: Schwabacher & Co., San
$ 5.00
$ 5,103.37
Francisco, California
Morthrift Plan, Sacramento,
$10,910.00
$ 978.00
California
Guardian Thrift and Loan, San
$ 2,245.04
$ 100.00
Francisco, California
Personal Living Expenses
$ 5,000.00
$ 5,000.00
ADJUSTED GROSS INCOME
$21,828.12
$14,683.69
*250 Year
Year
Year
Year
Ended
Ended
Ended
Ended
Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
1958
1959
1960
1961
ASSETS: Cash
Rochester Trust Co.,
$ 0.00
$ 0.00
$ 0.00
$ 0.00
Rochester, New Hampshire
Industrial City Bank,
0.00
0.00
0.00
0.00
Worcester, Massachusetts
Morthrift Plan, Sacramento,
6,468.93
13,566.38
14,107.55
23,444.26
California
Guardian Thrift and Loan, San
1,734.06
15,191.89
9,580.18
10,065.22
Francisco, California
Schwabacher & Co., San
646.34
(3,823.67)
1,549.81
352.92
Francisco, California
Fireside Thrift, San
6,559.50
6,824.48
7,136.79
7,463.40
Francisco, California
West Coast Savings,
0.00
0.00
4,045.75
4,229.92
Sacramento, California
Morthrift Plan, Stockton,
0.00
21,802.98
22,239.02
California
Total Cash
$15,408.83
$31,759.08
$ 58,223.06
$ 67,794.74
Stock
Cost of Stock acquired:
$40,354.34
$40,354.34
$ 40,354.34
$ 40,354.34
1956
2,617.47
2,617.47
2,617.47
2,617.47
1957
13,932.30
13,932.30
13,932.30
13,932.30
1958
1,217.00
1,217.00
1,217.00
1,217.00
1959
5,044.00
5,044.00
5,044.00
1960
220.00
220.00
1961
9,937.00
TOTAL ASSETS
$73,529.94
$94,924.19
$121,608.17
$141,116.85
LIABILITIES: NONE
NET WORTH:
$73,529.94
$94,924.19
$121,608.17
$141,116.85
INCREASE IN NET WORTH:
$ 9,066.77
$21,394.25
$ 26,683.98
$ 19,508.68
NONDEDUCTIBLE DISBURSEMENTS: Schwabacher & Co., San
$ 332.91
$ 32.72
$ 12.23
$ 18.28
Francisco, California
Morthrift Plan, Sacramento,
$ 0.00
$ 0.00
$ 500.00
$ 50.00
California
Guardian Thrift and Loan, San
$ 0.00
$ 0.00
$ 0.00
$ 0.00
Francisco, California
Personal Living Expenses
$ 5,000.00
$ 5,000.00
$ 5,000.00
$ 5,000.00
ADJUSTED GROSS INCOME
$14,399.68
$26,426.97
$ 32,196.21
$ 24,576.96
*251 The petitioner has introduced no evidence which would show any error in the Commissioner's net worth computation. Petitioner was physically present in the United States from August 1956 to July of 1957. At all other times throughout the years 1956 to 1961, inclusive, petitioner was traveling in Japan, Okinawa, Formosa, Manila, France, Belgium, Germany, Spain, Morocco and Switzerland. While thus traveling petitioner did not intend to make his home abroad. He lived in hotels and ate in restaurants. He "felt that the cost of living and travel over there was rightfully attributable to my income and deductable from the income that I reported * * *." During this time petitioner visited some 500 military service clubs abroad. In 1959, 1960 and 1961 petitioner paid Miss Inge Muench who was born and raised in Germany some $6,000 "for going to clubs with him." At the time she was under twenty-one years of age and most of the time she spent with petitioner was in Wiesbaden, Germany. In some unexplained way petitioner claims that he learned through contacts with employees of Service Games Ltd. of Gotenda, Tokyo how to "manipulate" the slot machines they manufactured so that he was able to *252 receive income from such "manipulation." This "manipulation" was either done by himself in the service clubs he visited or by servicemen who were club members and whom he was "teaching how to diagnose these machines as well as manipulate" them. When the servicemen whom he was "teaching" to "manipulate" the machines themselves played the machines, they did so under an arrangement with petitioner that when they collected a jackpot it was divided with petitioner. The percentage of the division between petitioner and the soldier player varied. If no jackpot was collected petitioner received no payment. Petitioner engaged in forms of gambling other than playing slot machines while traveling abroad during the years in question for substantial sums of money. Whether he won or lost is not established by the evidence. The evidence does not show that petitioner received any wages, salaries or professional fees or other amounts as compensation for personal services actually rendered during the years in question from sources without the United States. Opinion This case was calendared for trial at San Francisco, California for the session of the Court beginning November 1963, but was continued *253 at petitioner's request. It was recalendared for trial on the June 15, 1964 calendar, but petitioner's counsel withdrew and the case was again continued on petitioner's request. On August 6, 1964, petitioner asked that the case be calendared at the "next Tax Court calendar in San Francisco beginning about October 5, 1964 * * * because any further delay increases damages being suffered by the mover * * *." This was done and the case was called for trial on October 5, 1964. Petitioner appeared pro se and though cautioned by the Court about the difficulties he might encounter in properly presenting his case without counsel, he so proceeded anyway. Issues are generally framed by the pleadings. Patten Fine Papers, Inc., 27 T.C. 772. The only errors contained in the petition herein are two: (a) that the Commissioner failed "to credit petitioner for the income tax he reported and paid for the years 1956 through 1961 inclusive," (the Commissioner now agrees that an appropriate credit should be allowed) and (b) that the Commissioner erred in failing to credit petitioner with either a twenty thousand dollar annual exemption from income tax as an individual who qualifies for *254 such exemption under section 911(a) or an unlimited exemption from the payment of income tax as a bona fide resident of a country outside the continental limits of the United States, pursuant to section 911(a)(1). The Court pointed this out to petitioner, but nevertheless allowed him to present whatever evidence he had which he thought relevant and material to his case. Accordingly, the record is longer than it should have been. Petitioner himself testified. His testimony was general in character. He produced no records or documentary evidence at all of any materiality to the issues, despite the Court's leniency. This he sought to excuse because according to his testimony "the Germans got all of those records also along with the rest of them" and, "Well, the respondent has two or three hundred photostatic records of records confiscated, taken from me by the German officials," and "my records and books were taken by the German officials that arrested me." These allegations are unsupported by the record, except for the petitioner's own testimony, and what they would have shown, had they been available, is nebulous. The taxpayer had the burden of proof, and the impossibility of proving *255 a material fact does not relieve him of that burden. Interlochen Company v. Commissioner, 232 F. 2d 873. What the petitioner apparently sought to show, had evidence been adduceable, was that several of the net worth items included in the Commissioner's net worth computation were in error. Even under proper pleadings, the evidence adduced was insufficient to overcome the presumption of correctness which attaches to the Commissioner's determination, and we have so found. The next question is whether any part of the petitioner's income was exempt from taxation in the taxable years because it was exempt under section 911, I.R.C. 1954, as "earned income" received from "sources without the United States" from "wages, salaries, or professional fees," or "other amounts received as compensation for personal services actually rendered." Here again petitioner has failed to carry his burden of proving that any of his income was so exempt. Only by his own testimony has he attempted to carry his burden of proof. His testimony adds up mostly to argument that some amounts of his income received abroad were "earned" for "personal services" actually rendered. *256 But this self-serving testimony falls far short of carrying the burden which petitioner must carry in order to win his case. There is no evidence in the record which would permit us even to guess how much money was actually involved. So far as earning income for personal services is concerned, he says that he was paid for teaching soldiers how to diagnose and manipulate slot machines and that his income was thus earned from his services. Petitioner's "take" from the collection of jackpots is interesting. A portion of his testimony follows: [By respondent's counsel] Q. The only income you have derived is your manipulation of these slot machines; is that a good word? A. You might call it a good word if you want. Q. I am asking you for your word, Mr. Robida? A. Well, I don't agree with you I received income only from manipulation of the machines, but you can put it that way, too. I received most of my income from soldiers that I was teaching how to diagnose these machines as well as manipulate these machines. THE COURT: How much did you determine each one of these soldiers would pay you for your so-called services? THE WITNESS: I left it more or less up to the soldier, *257 and as a rule he left the jackpots up to me, which occurred along the rounds of showing him how to make these jackpots That was the main source of the payment. Many times they offered me advance payment. THE COURT: Do you mean if the machine did not pay off the soldier did not pay you? THE WITNESS: He lived up to his agreement. There was some soldiers that paid me in advance. As a rule, I would give the soldier's money back before very long because that's the way it worked out. I didn't take the man's money if he didn't benefit from it. THE COURT: To me that would mean your earnings from the soldiers depended on what they earned from the slot machines or what they took from the slot machines as winnings; is that right? THE WITNESS: Well, what they and I both took, yes, more or less, let's put it that way. BY MR. CIRANNI: Q. It was actually you who did the manipulating of the machines most of the time, the vast majority of the time? A. I wouldn't say that, but I had to teach them. In the first place, there is a lot of things involved to manipulating a machine. Unless someone knows what they are doing they ain't going to pick up very fast. Q. Actually, you were't able *258 to teach anybody to pick up very fast, were you? A. No, I wouldn't say that. Experience counts quite a lot. What it might take one person two years to learn you might teach in five minutes, but that isn't going to let anybody succeed in it, you see. Q. So, the only successful one was you? A. I wouldn't say I was the only successful one. You probably know quite a lot to the contrary. There has been 25 or 30 different soldiers in Europe that have been notorious at beating slot machines all the way from Privates to Colonel, and it is quite a well-known fact in the Military. That's why they went out of their minds about me because they figured this way others learned from others I taught. Q. How many people did you teach? A. I taught around 100 people in six years' time, and I think I was in five hundred clubs in Europe and Africa. I think you could say for the six years' time that I have went in five hundred clubs, and I would still be welcome in about 99.5 percent of those clubs right now. I was always welcome in a great majority of them. To the Court this does not prove that the petitioner had any exempt income which could be called "earned income" under section 911 as *259 wages, salaries or other amounts received for personal services actually rendered. Perhaps the petitioner and the soldiers behind whom he was standing or making suggestions to while they played the slot machines and sometimes collected jackpots and divided with petitioner, had a mutual agreement to divide the collections with petitioner, and they did so. But at most, even if we give petitioner's testimony full credence, and could determine how much money was involved, the money so collected and divided, was not "compensation for personal services actually rendered" by petitioner. It was a type of joint venture between petitioner and the soldiers - not a payment to petitioner by the soldiers for personal services which he rendered to them. Furthermore, as indicated above, there is no evidence in the record to prove, even if we were disposed to accept petitioner's argument, which we are not, how much money he received for his so-called "personal services". He has utterly failed in his proof. Though he argues that the amounts claimed on his returns as exempt are substantiated by his records, he has not produced a single record of such receipts, except the tax returns. These are not proof *260 that the amounts claimed are correct. Watab Paper Co., 27 B.T.A. 488, 506. On the whole, the petitioner's justification for his course of conduct is interesting but not very logical or convincing. On brief he says: What I did defeated the element of chance and gambling, it broke the spell of addiction to gambling for hundreds and hundreds of soldiers in many countries who merely heard that the slots could be beat, to say nothing of their dependents who often shared the pains and loss of gambling addiction. What I taught was unique especially because one who profits defeating the element of chance does so usually by promoting the gambling in the first place, whereas I taught soldiers to do two things with one stroke 1. Beat the game of gambling itself hence breaking addiction to it generally 2. beat the element of chance to make a profit for themselves by their skill and knowledge. The money I earned is qualified under Section 911(b) Code of 1954 as "other amounts received as compensation for personal services actually rendered, * * *". Most of petitioner's testimony and argument deals with his personal problems with German and United States officials abroad, including *261 an alleged attempt on his life by an erstwhile friend who "fashioned his camping stove into an improvised flame thrower". Again, this testimony, while interesting, and, if believed, might call for sympathy, has little to do with this case. No evidence was offered to meet the issue of liability under section 6654 for failure to pay any estimated income tax in the years in question and the Commissioner is sustained in his determination of this liability. Decision will be entered under Rule 50.